CLEMENT (UNITED STATES v.). See Case No. 14,815.

## Case No. 2,883.

### ·CLEMENT'S EX'RS v. DICKEY.

[1 Paine, 377.] [1]

Circuit Court, S. D. New York. April Term, 1825.

#### AUTHORITY OF MASTER TO DRAW BILLS OF ·EXCHANGE.

The owner of a vessel sent her from New-York, consigned to his correspondents at Antwerp, with directions that they should despatch her to India, furnishing the master with a letter of credit, entitling him to draw on London for 5,000 pounds. The master was instructed if he should not have funds to purchase a cargo in India, to "extend his drawing." Being in want of funds, he drew, not on the house in London on whom he had drawn the 5,000 pounds, but on the consignees at Antwerp, who had obtained the letter of credit, and to whom the vessel and cargo were to return. *Held,* that the bills were drawn without authority, and should have been drawn on the house in London.

·At law. This was an action of assumpsit [by Clement's executors] to recover of the defendant [Robert Dickey] the amount of three bills of exchange, drawn by Francis Allyn, as master of the defendant's ship, Frances Henrietta, upon Parish, Agie & Co. of Antwerp, and for goods sold and delivered by the plaintiffs' testator to Allyn, as such master. The cause was tried at the September term, 1823, and now came before the court on a case made by the plaintiffs. At the trial it appeared on the part of the plaintiffs, that Allyn, in April, 1818, sailed as master of the defendant's ship, Frances Henrietta, on a voyage from New-York to Antwerp. The vessel was consigned to Parish, Agie & Co., who were to decide after she arrived at Antwerp, whether the voyage should be continued round the Cape of Good Hope. Allyn was informed by his letter of instructions, that if such an extension of the voyage should be determined on, "Parish, Agie & Co. were to put on board the ship 55,000 or 60,000 Spanish dollars, and to furnish an effective letter of credit, to enable his passing bills from the port of lading, on Holland or London, to the amount of 5,000 pounds sterling; and that after leaving Antwerp, the care and management of the voyage would be reposed in him." He was also instructed by the same letter, "to proceed to the Isle of France, to procure on fit terms, a cargo chiefly of coffee and sugar, and if he should there discover that it would be more advantageous to go to Batavia, to proceed thither. If disappointed at Batavia, to proceed on to Manilla, or return by the Isle of France, or go to Bombay, or Calcutta. That wherever he might load, it was the defendant's desire, that it should eventually be a full cargo, and that if the specie and credit he carried should fall short, he could take on freight or extend his drawing, and if

needful, give security by bill of lading on so much of the shipment as his extra credit paid for. To return to Europe when loaded, proceeding to such port in the British Channel as Parish, Agie & Co. might point out to receive their orders as to what port of discharge he should take the ship to, which would be Antwerp, or a port in Holland. That he should have the papers both outward and homeward made out for the defendant's account and risk, the outward cargo to be consigned to himself, and the homeward to Parish, Agie & Co." He was further directed, "to acknowledge in writing to Parish, Agie & Co. these orders of the defendant; to inquire at Antwerp about the crops of grain, which would affect rice, and help him in his conclusion as to filling up with that article, particularly if his funds should be short." He was also informed, "that if this voyage to India should be undertaken, the defendant would, when he should hear that it was determined on, effect the necessary insurance, and would also again write, so that the letter would reach him before he left Antwerp." In June the ship arrived at Antwerp, to Parish, Agie & Co., who directed the master to proceed on the India voyage, and furnished him with 55,000 dollars in specie, and a letter of credit on Thomas Wilson & Co. for 5,000 pounds sterling. The master received no written instructions from Parish, Agie & Co., but was verbally directed by them to proceed to the Indian seas. The letter of credit contained a provision, that the proceeds of the drafts should be invested in goods and shipped on board the Frances Henrietta, to Holland, to Parish, Agie & Co. The ship not being able to enter at the Isle of France, went to Batavia, where she arrived the 2d of December, 1818. There had been lately a great rise in the markets, but the master, on the whole, concluded to purchase of Clement, the defendant's testator, 2,700 piculs of coffee at 30 dollars per picul, and 514 piculs of sugar at 9 dollars 50 cents per picul, at the specie value of a dollar, for which he paid him in the specie and proceeds of the drafts on Thomas Wilson & Co. These funds being inadequate to the payment of the amount purchased of Clement, Allyn showed him his letter of instructions, and probably also another letter he had received while at Antwerp, from the defendant, dated May 23d, 1818, advising him about prices, and informing him, that sugar at about five cents pound English would be the best return cargo, and coffee at 21 or 22 cents without our duty, the next best. Allyn and Clement then entered into an agreement in writing, that Clement should receive from Allyn in payment of the residue of his purchase, bills of exchange drawn by Allyn on Parish, Agie & Co. in favour of Clement for 5,900 pounds sterling, payable in London, and that as security for such bills, Allyn should ship 700 piculs of coffee contained in 763 bags as per invoice and bill of lading,

---

[1] [Reported by Elijah Paine, Jr., Esq.]

consigned to Clement, freight free, and that on the payment of the bills, the invoice and bill of lading should be endorsed and given up to Allyn's order. The bills were drawn at the rate of 5 shillings 2 pence the dollar, so as to allow Clement the difference in exchange. Allyn believed that this agreement was according to his instructions, and that he was authorized to draw as he did. Clement was the master of an American ship then on a voyage to India, and the sugar and coffee sold to Allyn, had been purchased by Clement at Batavia, for his own ship, but he had changed his mind in consequence of intelligence received, and determined to go to Canton. Allyn wished to purchase no more of Clement's cargo than he had funds for, but Clement would not break it. In pursuance of their agreement, Allyn drew the bills of exchange, and also delivered to Clement the bill of lading and invoice of the 763 bags of coffee, which were shipped for account and risk of the defendant. Allyn informed Clement, that he had ordered insurance upon that part of the cargo which exceeded his funds, but it was understood that either he or Clement might order the insurance to be effected. They both sent orders for the insurance to London, where their correspondents made an arrangement that it should be insured on Clement's order, and not on Allyn's. Nothing was said about insurance in the written agreement. The Frances Henrietta arrived at Antwerp in October, 1819, consigned to Parish, Agie & Co. The cargo was delivered to them; the 763 bags of coffee on account of Clement, and the residue on account of defendant. It also appeared that Clement received the 55,000 Spanish dollars at par, although they were worth a premium of ten per cent. Government sales, however, were always made for dollars, and just before Allyn's arrival at Batavia government sales of coffee had been made at 22 dollars per picul, but the prices had risen very rapidly, and before he made the purchase of Clement, these sales had been made at 33 dollars. Allyn could not obtain at Batavia either a full or part freight. The price of rice was 2 dollars per picul. A picul is equal to 133 pounds. Samuel Williams, who effected the insurance for Clement on the 763 bags of coffee, paid a premium amounting with charges to 171 pounds 5 shillings and 6 pence. He also paid for Clement 40 pounds for law expenses, on account of the bills of exchange. The proceeds of the 763 bags amounting to 4,842 pounds, were also remitted to him for Clement's account, and Williams's charges amounted to about 50 pounds. On the 29th September, 1819, Allyn, on his passage from Batavia to Antwerp, touched off Dover, and there received notice of the protest of the bills for non-acceptance, and while he was at Antwerp, a judgment was recovered against him at the suit of Clement on the bills. The protest for non-acceptance was dated the 13th of August, 1819, and of non-payment the 12th of November following. No other notice of the protest of the bills was ever received by either the defendant or Allyn, than the one received by the latter when he touched off Dover. A deposition of Allyn, proving most of the facts of the case, to which was annexed a release to him from Clement, executed before the taking of the deposition, was read at the trial, but objected to by the defendant's counsel, on the ground of interest in the witness. The court charged the jury, that Allyn was authorized to purchase the cargo of Clement, but not to draw bills in payment on Parish, Agie & Co. and that the plaintiffs could not therefore recover damages on the bills or reexchange. That in making up their verdict, they should allow the defendant credit, without any premium, for the monies paid the plaintiff, and the proceeds of the 700 piculs of coffee shipped as security; and find the balance of the price of the coffee for the plaintiffs. That the plaintiffs were not entitled to recover for the insurance and law charges. The jury found a verdict for 6,818 dollars 21 cents.

H. D. Sedgwick and R. Sedgwick, for plaintiffs, contended, that the bills were drawn by the master necessarily and bona fide; and that the proper construction of the expression "extend your drawing," was, that he should draw on his consignees, who were the only persons to draw on except Thomas Wilson & Co., whose letter of credit had been exhausted, and on whom, of course, he had no right to draw.

C. Graham for defendant, contended, 1. That Allyn was not on account of his own liability as drawer of the bills, under the circumstances of the case, a competent witness on the part of the plaintiffs. 2. That the plaintiffs could not recover on the bills of exchange. They were drawn without authority. The master, it is conceded, could not have drawn the bills without the power to draw contained in his letter of instructions. Parish, Agie & Co., as he was informed by that letter, were to furnish him with a letter of credit, which would enable him to draw to the amount of 5,000 pounds on Holland or London. They were to determine whether the drawing should be on Holland or London, and did determine in favour of the latter place. The authority of Allyn to extend his drawing was, therefore, an authority to draw only on Thomas Wilson & Co. of London. 3 Term R. 757; 1 Esp. 111; 2 J. P. Smith [Eng.] 79, 80; 1 Taunt. 347; 2 Johns. 48. The release to Allyn enured to defendant's benefit, and destroyed the plaintiffs' right of action on the bills. [M'Fadden v. Parker] 4 Dall. [4 U. S.] 275; 2 Caine. 121; 12 Johns. 189. No notice was given to the defendant of the protest of the bills. Chit. Bills. 213–216. 3 That the defendant was entitled to have credit for the whole proceeds of the 700

piculs of coffee shipped as a security for the bills of exchange and the interest thereon; and that the charges for insurance, law expenses, commissions, &c. mentioned in Samuel Williams' account, ought to be rejected. 4. That the plaintiffs were not entitled to damages or re-exchange upon the bills. 5. That if the defendant was at all liable to the plaintiffs, it was upon the footing of an account stated between the plaintiffs' testator and the defendant for goods sold, crediting the defendant with the monies paid at Batavia, and the proceeds of the 700 piculs of coffee. 6. That interest ought to have been calculated at 5, and not 7 per cent.

THOMPSON, Circuit Justice. The main question in this case relates to the authority of Captain Allyn to draw the bills, which form the principal subject of litigation in this cause. It is objected, however, preliminarily, that Captain Allyn, who was admitted as a witness, was incompetent on the ground of interest; the bills appearing on their face to have been drawn by him on his own account, and not as agent of the defendant. This objection however is not tenable. For admitting Captain Allyn's personal responsibility upon the bills, he was completely discharged therefrom by the release given to him previous to his examination. This release not only embraced his liability on the bills of exchange, but extended to all matters touching this suit. And besides, if he by exceeding his instructions had thrown on the defendant a loss, he would be responsible over to him. His interest was, therefore, against the party calling him; as by exonerating Dickey he would screen himself from any responsibility over to his principal.

This objection being out of the way, I proceed to examine the point whether Captain Allyn had authority to draw the bills in question. It has not been contended that the character of master of the ship would confer upon him such authority for the purpose for which the bills were drawn. It must, therefore, arise entirely from his letter of instructions, if it existed at all. And the opinion I entertained upon the trial, that no such authority is to be found in his instructions, is strengthened and confirmed, by farther reflection and a more attentive examination of the question. He was a special agent, and bound to pursue strictly the orders of his principal, where no latitude of discretion was left to him. We must, therefore, look to these instructions only to ascertain his authority on this subject. From their general scope and object it is fairly to be inferred that the defendant intended to provide funds to purchase a full return cargo for his ship. But he chose to point out the way in which these funds were to be procured, and his agent had no authority to depart from his instructions. Captain Allyn, on the outward voyage from New York, went consigned to Parish, Agie & Co. of Antwerp, and was to receive their instructions as to its farther prosecution; and in case it should be round the Cape of Good Hope, they were to furnish him with fifty-five or sixty thousand Spanish dollars, and an effective letter of credit to enable him to pass bills from the port of lading of the return cargo on Holland and London to the amount of five thousand pounds sterling. Parish, Agie & Co. on the arrival of the ship at Antwerp, determined to send her round the Cape, and accordingly furnished Captain Allyn with fifty-five thousand Spanish dollars, and procured for him a letter of credit from Thomas Wilson & Co. of London, for five thousand pounds sterling. The defendant, however, to guard against a deficiency of funds, adds, in his instructions, the following clause: "Wherever you load, I wish it eventually to be a full cargo, and if the specie and credit you carry should fall short, you can take on freight, or extend your drawing; and. if needful, give security by bill of lading on so much of the shipment as your extra credit pays for." The captain, at Batavia, where he purchased a return cargo of coffee and sugar, finding the funds with which he had been provided insufficient to purchase a full cargo, drew the bills in question on Parish, Agie & Co. And whether he had authority so to do, depends on the clause in his instructions above cited.

When these instructions were made out, it was unknown to the defendant on whom the captain would have authority to draw for the five thousand pounds expressly provided for. That was to be left to Parish, Agie & Co. who procured the engagement of Thomas Wilson & Co. of London. to accept Captain Allyn's draft for that amount. And the contingent provision for further drafts in case of necessity. has reference to the first drawing. This is not only the literal interpretation of the language made use of, but the fair construction of what was the understanding and intention of the defendant. The word "extend" is relative in its application, and refers to something already begun, and implies a continuation of the same act. A power to extend or continue an act or piece of business. cannot authorize a totally distinct transaction. Can an authority to draw on A for a certain sum, with a contingent power to extend such drawing, by any possibility confer the right of drawing on B for such further sum? Suppose the letter of instructions had expressly directed the draft for the five thousand pounds sterling to be made on Thomas Wilson & Co. of London: Can there be a doubt, but that the authority to extend the drawing would be limited to drafts on the same house? And if so, what difference can it

make whether the house of Thomas Wilson & Co. was designated by the defendant himself, or by Parish, Agie & Co. by his authority? As soon as this designation was made known to Captain Allyn, it was precisely the same as if inserted in his original instructions; and his extended drawing was therefore restricted to the house of Thomas Wilson & Co. I can discover no more authority from the letter of instructions to draw on Parish, Agie & Co. of Antwerp, than on any other house in Holland or London. Captain Allyn no doubt acted in good faith, and supposed his drafts on Parish, Agie & Co. would be accepted, as the return cargo was to be consigned to that house. But it will be recollected that this house furnished the funds to purchase the return cargo; and the case discloses no evidence of the state of accounts between the defendant and Parish, Agie & Co. or the indemnity which the latter had for such large advances. And besides, they could not with propriety have accepted these bills, with a view of looking over to the defendant for reimbursement; for there can be no doubt that Captain Allyn's instructions were made known to them, not only because he was directed by the defendant to communicate his orders to that house, but the agency they were to have in projecting the voyage, made such a communication necessary and proper. This house then knowing the authority given to Captain Allyn to extend his drawing, and knowing that the first draft for the five thousand pounds was to be upon Thomas Wilson & Co. must have known that Captain Allyn had no authority to draw on them; and, of course, that Dickey could not be made responsible for such drafts. Nor could they have reasonably calculated upon indemnity from that part of the cargo purchased with these bills; for, although by the defendant's instructions the return cargo purchased with the funds taken out by Captain Allyn, was to come consigned to them, yet they knew from his instructions that he had authority to give security by bill of lading, on so much of the cargo as was paid for, by the extra credit. Nor could Clement have had any just grounds to suppose these bills would have been accepted. He was fully apprised of Captain Allyn's instructions, and was bound to know their legal import, and of course on whom he had authority to draw; and the precaution he observed, by taking security on the cargo, shows that he did not place implicit reliance on the bills themselves.

The right of the plaintiffs, therefore, to recover upon these drafts, as bills of exchange, cannot, I think, be sustained. And this is conformable to the real justice of the case, as it will put at rest all claim for damages, by reason of the bills having been protested, which I should consider at least a hard case, if under any circumstances I felt myself bound to allow it. But although the action cannot be sustained upon the bills of exchange, yet I think the defendant is answerable, as for goods sold and delivered, for the whole of the cargo purchased by Captain Allyn of the plaintiff's testator. Believing, as I think I am fully warranted in doing, that Captain Allyn acted in good faith, and with a view to promote the interest of his principal, his instructions ought to receive a liberal construction, where there is any latitude of discretion given. In a voyage so distant as the one in question, it is impossible to foresee and provide for every event, and some discretion must almost necessarily be left to the agent who is to have the management. In the present case we find in Captain Allyn's instructions these clauses: "After leaving Antwerp, the care and management of the voyage will be reposed in you."—"Wherever you load, I wish it eventually to be a full cargo, and if the specie and credit you carry should fall short, you can take on freight, or extend your drawing, and, if needful, give security by bill of lading on so much of the shipment as your extra credit pays for." It is evident from these parts of the instructions, it was the wish and intention of the defendant that at all events the ship should return with a full cargo. And Captain Allyn had authority to purchase it, and give the security he did by bill of lading. An account must therefore be stated between the parties, as for goods sold and delivered by the plaintiff's testator to defendant, to the full amount of the cargo; crediting the defendant with the moneys paid at Batavia, and the proceeds of seven hundred piculs of coffee, deducting therefrom the sum paid for insurance, and rejecting all the other charges in the account of Samuel Williams.

Upon the trial I thought the insurance ought not to be allowed; but, upon further reflection, I am inclined to allow it. Captain Allyn, by his instructions, was authorized to give security on the shipment paid for by his extra credit; and to make this security effectual and safe, insurance was necessary. It was actually paid on account of the plaintiff's testator. And the case fully warrants the conclusion, that no insurance was effected by the defendant that would have covered this part of the cargo. The purchase of the cargo was entire, and laying the bills out of the question, as I have done, there is no rule or principle by which a distinction can be made as to price between that part paid for at Batavia and the other part of the cargo. The sale was undoubtedly a very advantageous one for Captain Clement. Captain Allyn was averse to taking any more than he could pay for with the funds he had, but Captain Clement insisted on his taking the whole. The bills being out of the question, we must look to what Captain Allyn did, which was authorized by his instructions. He gave security on a

part of the cargo, as he had a right to do, by assigning to the order of Captain Clement seven hundred piculs of coffee, which went free of freight, and out of the proceeds of this coffee he had a right to pay himself for the balance; as this coffee was not charged with freight or insurance, there was every reason to conclude it would be amply sufficient to pay the balance due Captain Clement.

Under these circumstances, I think it would not be just to charge the defendant with interest before the arrival of the vessel at Antwerp. The account must therefore be made up as upon an entire purchase, crediting what was paid at Batavia; the balance payable out of the proceeds of the seven hundred piculs of coffee, which came consigned to Clement's order. That not being sufficient, interest must be allowed on such balance from the time it was ascertained at 5 per cent.; balance payable in London, as the whole transaction, as appears evidently to have been the understanding, was to be wound up there.

The account must be stated on the principles above laid down, and judgment entered for the balance.